## STUDEBAKER CORPORATION OF AMERICA v. HANSON.

(No. 818;  Decided May 17th, 1916;  157 Pac. 582.)
(Rehearing denied October 16th, 1916.)

SET-OFF AND COUNTER-CLAIM—"SUBJECT OF THE ACTION"—PRINCIPAL AND AGENT—PROOF OF AGENCY—DECLARATIONS OF AGENT—AUTO-MOBILE SALES AGENT — CIRCUMSTANTIAL EVIDENCE ESTABLISHING AGENCY—APPEAL AND ERROR—HARMLESS ERROR—EVIDENCE—SALES — BREACH OF WARRANTY — EVIDENCE OF VALUE — EVIDENCE OF DAMAGES—TRIAL—INCONSISTENT INSTRUCTIONS—PRESUMPTIONS—WAIVER—REHEARING.

1. In an action for repairs to an automobile, where the defense was that the repairs were made in an attempt to make good plaintiff's warranty in the sale of the machine, a counter-claim for breach of the warranty, is one connected with the subject of the action, and so authorized by Compiled Statutes, 1910, Section 4391, whether the "subject of the action" which within the meaning of the statute is either the property involved or a right alleged to have been violated.

2. It is not an attempt to prove agency by declarations of the agents, where sufficient independent circumstantial evi-

dence is introduced for that purpose and their declarations introduced are confined to admissions of a defective condition of an article.

3. An agency may exist within the meaning of the automobile trade, where one is authorized to purchase from the manufacturer at a discount from the list price and retail within a specified territory at the full list price.

4. Any error in admitting copies of letters was harmless, their only effect being to explain the purpose of later correspondence, and such purpose being made evident by subsequent letters in evidence, and their effect as proof of a certain matter being merely cumulative, so that they might be excluded without materially lessening the effect or weight of the correspondence as evidence for the purpose for which it was offered.

5. That the value of the automobile, if in good condition, would have been the sales price of $1,350, was sufficiently proved for the buyer suing for breach of warranty, by testimony of the seller's witness that its value as received, taking into consideration its condition at that time was $1,250, and that in placing that value on the car as received he had deducted $100 from the list price; thus clearly indicating that the list price would represent the value of the car in perfect condition.

6. Two instructions on measure of damages for breach of warranty in a sale of an automobile, varying only in using in one the term purchase price, and in the other value of the car had it been as warranted, are not inconsistent in fact; the evidence showing such value to be such price.

ON PETITION FOR REHEARING.

7. When the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that proof, if produced, instead of rebutting, would support the inferences against him.

8. An exception taken to the denial of a motion by plaintiff to require defendant to elect upon which of several alleged causes of action in his counter-claim he desires to proceed, not presented in plaintiff's original brief, will not be considered on a petition for rehearing.

Error to the District Court, Laramie County; Hon. William C. Mentzer, Judge.

Action by the Studebaker Corporation of America against Alpheus P. Hanson. From a judgment for defendant on a counter-claim plaintiff brings error. The facts are stated in the opinion.

*Wm. C. Kinkead* and *Dana & Blount,* for plaintiff in error.

The matter set forth in defendant's cross-petition is not properly pleadable as a counter-claim, as it did not arise out of the contract or transaction set forth in plaintiff's petition as the foundation for its claim and is not connected with the subject of the action; there is nothing in the record upon which it could be claimed that the repairs and supplies sued for were made necessary by reason of the alleged breach of warranty; the court erred in admitting evidence of acts and declarations of alleged agents for the purpose of proving agency. (Brigham v. Peters, 1 Gray 139; Streeter v. Poor, 4 Kan. 353; French v. Wade (Kan.), 11 Pac. 138; Railway Co. v. Kinman (Kan.), 31 Pac. 126; Hatch v. Squires, 11 Mich. 185; Howe v. Clark, 15 Kan. 272; Mechem on Agency, 100.) It was error to admit the testimony of defendant and cross-petitioner as to declarations of Hicks for the purpose of proving the identity of plaintiff. (Bohart v. Obner, 13 Pac. 388; Lin v. Mayer, 34 Pac. 970.) An agent can bind his principal only to the extent of his authority. (Cook on Corporations, 726; Browning v. Kinkle (Minn.), 51 N. W. 605, 606; Brandy v. Ferebee, 68 N. C. 356.) The agency must be first established. (Rosenstock v. Tormey, 32 Md. 169; Shesler v. Patton, 100 N. Y. Sup. 286; Mathes v. Lumber Co., 158 S. W. 729.) The relation of principal and agent cannot be established by the acts and conduct of the alleged agent. (Wood Co. v. Crow, 30 N. W. 609; Fleming v. Daly, 56 Pac. 946; Cronquist v. Smith, 133 Pac. 130; Sloan v. Sloan, 78 Pac. 893.) Declarations of repair men are inadmissible to prove the identity of their employer; there was no evidence of value. Under instruction No. 4 the verdict could not exceed $100.00; instructions Nos. 4 and 8 are in conflict. Instruction No. 8 was an incorrect statement of the law as to the measure of

damages for breach of warranty; the two instructions on measure of damages were inconsistent in the giving of said instructions and were reversible error. (Mechem on Sales, Sec. 1817; Hook v. Stovall, 26 Ga. 704; Park v. Richardson Co. (Wis.) 64 N. W. 859; Douglas v. Moses, 65 N. W. 1004.) The true measure of damages for breach of warranty is the difference between the value of the article and what it would have been if it had been as represented. (Allen v. Anderson, 22 Tenn. 581; Himes v. Kiehl, (Pa.) 35 Atl. 632; Stilwell-Bierce Co. v. Biloxi Canning Co., 29 So. 513; Sanderson v. Trump Mfg. Co., 102 N. E. 2; Skoog v. Mayer Bros. Co., 142 N. W. 193; Rossi v. Beaulieu Vineyard, 130 Pac. 201; White Automobile Co. v. Dorsey, 86 Atl. 617; Foster v. Smith, 163 Ill. App. 613; Skerrill v. Coad, 138 N. W. 566; Shaw v. W. S. & S. Co., (Col.) 128 Pac. 480.) There was no evidence to connect plaintiff with the sale or warranty of the automobile; the assignee of a chose in action does not assume any obligation of the assignor to the debtor. It was error to admit secondary evidence of documents without laying the foundation therefor. Copies of letters are not admissible in the absence of notice to produce the originals. (Elliott on Evidence, Sec. 1489; Burlington Lumber Co. v. Whitebreast Coal, &c. Co., 66 Iowa 292, 23 N. W. 674; Foot v. Bentley, 44 N. Y. 166; Traber v. Hicks, 131 Mo. 180, 32 S. W. 1145; Anglo-American, &c. Co. v. Cannon, 31 Fed. 313; Vol. 1, Sec. 208; Elliott on Evidence, Sec. 1419-1420; Anglo-American Packing & Provision Co. v. Cannon, 31 Fed. 314.)

*W. E. Mullen* and *H. S. Ridgely,* for defendant in error.

It was proven that the repairs and labor sued for were furnished to make good the plaintiff's warranty; it was proven that defendant relied upon published representations of plaintiff given him at the time of the sale and that plaintiff was the identical Company that sold the automobile through its agents at Denver. It was proven that plaintiff, existing under other corporate names, had con-

ducted its business for more than sixty years prior to the
sale and that it had merely reorganized its business under a
new name; the Denver concern was a branch agency of the
plaintiff company; the agency of Hicks and others who
were connected with the sale transaction and efforts made to
comply with the plaintiff's warranty was proven by an ar-
ray of circumstances independent of their declarations made
to defendant.    Plaintiff is chargeable with the breach of
warranty pleaded. There are exceptions to the rule that
agency cannot be proved by acts and declarations of the
agent (Missouri Pac. Ry. Co. v. Simons, et al., 25 S. W.
996) ; where an agency is once held to be general and not
special.    (Johnston, et al. v. Milwaukee & Wyoming In-
vestment Co., 46 Neb. 480; Fore v. Hitson, 70 Tex. 520,
8 S. W. 292; Smith v. Wise, 58 Ill. 141; Haskell v. Star-
bird, 152 Mass. 118, 25 N. E. 14; Rowland v. Apothe-
caries' Hall Co., 47 Conn. 387; Townsend, Executor, v.
Edward Chappell, et al., 12th Wall. 681, 20 Law. Ed. 436;
Murphy v. W. H. and F. W. Crane, Ann. Cas. 1913D.
643.)    Defendant's exhibit J was admissible.    (Field v.
Farrington, 19 Law Ed. 923; Indianopolis Co. v. St. Louis
Co., 30 L. Ed. 639.) The agency having been established by
other evidence, the testimony of Hicks was admissible.
(Henderson v. Coleman, et al., 115 Pac. 439.) An employer
is bound within the limits of authority which' he has ap-
parently delegated to his agent.    (31 Cyc. 1219; Hanover
Bank v. American Dock Co., 148 N. Y. 612, 43 N. E. 72,
51 Am. St. 721.) The value of the automobile was proven
as well as the cost of the new motor. There is no evidence
in the record upon which to base requested instruction No.
10 and it was properly refused. The copies of letters re-
ceived in evidence were admissible, as plaintiff failed to
account for the original.    (Abbott's Trial Evidence, pp.
326-355; Chesapeake & Ohio Railway Co. v. Stovk, 51 S.
E. 161, 104 V. 97; Union Surety & Guaranty Co. v. Ten-
ney, 65 N. E. 688, 200 Ill. 349; Seibert's Assignee v. Rags-
dale, 44 S. W. 653, 103 Kentucky 206.)    Instruction No. 11

was properly refused. (Hall v. Studebaker Corporation of America, 79 S. E. 750.)

POTTER, CHIEF JUSTICE.

The Studebaker Corporation of America brought this action in the district court against Alpheus P. Hanson to recover an amount alleged to be due for goods, wares and merchandise furnished and labor performed during the months of July and August, 1911, at the request of the defendant, and on his promise to pay therefor. It appears from the evidence that plaintiff's claim was for supplies furnished and labor performed for the purpose of correcting a defect in the construction of an automobile. The petition alleged that the work was done and the goods furnished by the Studebaker Colorado Vehicle Company, a corporation duly organized and existing under the laws of the state of Colorado and carrying on business in the city of Denver in that state, and that on or about the first day of January, 1913, the plaintiff purchased all of its accounts including the account sued on, and that the same had been duly assigned to the plaintiff.

The answer denies generally the allegations of the petition, and alleges in substance that in 1910 a corporation known as "The Studebaker Corporation" was doing business at Denver, Colorado, through a branch house and sales agency known as the "Studebaker Colorado Vehicle Company"; that it was re-organized some time prior to January 1, 1913, under the name of "The Studebaker Corporation of America," and that the plaintiff as so re-organized is the same company as the Studebaker Corporation that had been doing business in 1910 through the said Studebaker Colorado Vehicle Company at Denver; that during said year of 1910, the defendant bought of the Studebaker Colorado Vehicle Company, "a branch house and a representative agent of the Studebaker Corporation," an E-M-F automobile, under a guaranty that the same was a good and perfect car, and that if it was not perfectly satisfactory to the defendant the plaintiff would make it so, and that defendant

bought the automobile, relying on said guaranty, paying to the said company the sum of $1,350 cash for the same, "the said corporation at the time warranting that the said machine would do good work, and that if it failed in any particular it would put it in good shape." The answer then alleges a breach of the warranty by setting forth the facts of defendant's experience with the car, to the effect that it did not work right from the time of the purchase, that after having repeatedly examined and tested the car in an attempt to ascertain the cause of the trouble, the plaintiff, through its agent, in 1911, took the car to Denver and agreed to put it in shape for use, provide a new engine if necessary, or replace the car with a new one; and that all of the expense and work done on the car for which plaintiff claims pay was done by the plaintiff company at its own instance and not at defendant's request. The answer further alleges that after the car was so kept a long time it was returned to Cheyenne and it was stated to defendant that a new engine had been put in, but that the substituted engine was an old one, badly worn in all its parts and practically worthless; "and that nothing was furnished the defendant by way of work or material save at the option of the said corporation that sold the car and while it was endeavoring to put the car in commission; that during the time said corporation was trying to fix said car it ran it a good many miles without the consent of the defendant, and the gasoline used by the said corporation, and for which it now claims pay, was used by it for its own pleasure and not for the defendant."

For further answer and by way of cross demand the same facts are substantially again alleged; that the car so bought of the plaintiff instead of being worth $1,350 is and was of no value whatsoever; and that by reason of the failure of the plaintiff to fix the car so that it would work or give the defendant a new car as it agreed to do, the defendant has been damaged in the sum of $1,350, and judgment is demanded therefor. The reply denies generally the allegations of the answer and cross demand, and also specifically that

the Studebaker Colorado Vehicle Company was the representative and agent of the plaintiff in 1910 or at any other time.

The cause was tried to a jury, without any evidence being offered by the plaintiff in support of its claims alleged in the petition, and a verdict was returned in favor of the defendant for $550. Judgment was entered upon the verdict, after the overruling of plaintiff's motion for a new trial, and the plaintiff brings error. It is stated in the brief for each of the parties that prior to the trial the plaintiff dismissed its cause of action, and the case will be considered on that theory, though there is nothing in the record showing such dismissal, except a mere reference to the fact thereof at one place in the transcript of the testimony and plaintiff's failure to produce any evidence in support of the petition. Whether or not there was a formal dismissal, it is at least evident that the plaintiff abandoned its alleged cause of action, and the case appears to have proceeded to trial on the defendant's counterclaim under the provision of the statute (Comp. Stat. 1910, Sec. 4611) that where a counterclaim is pleaded the defendant may proceed to the trial of his claim, although the plaintiff has dismissed his action or fails to appear.

The first question to be considered is whether defendant's alleged cause of action is pleadable as a counterclaim in this action, counsel for the plaintiff contending that it is not. It is argued in support of that contention that the counterclaim could not have arisen out of the contract or transaction set forth in the petition as the foundation of the plaintiff's claim, since the defendant's cause of action, if established, accrued before the indebtedness sued on by the plaintiff was incurred; and that it is not connected with the subject of the action, for that was to recover an alleged amount due upon an account for supplies and labor in repairing an automobile, and although the car sold to defendant was the one repaired it does not appear that such repairs were required by the alleged warranty or made necessary by the breach there-

of. But counsel are mistaken in assuming by their argument that the account sued on had no relation to the sale and purchase of the car or the alleged warranty thereof. Although it does not seem to be specifically alleged in the answer that the various items of supplies and labor stated in the account sued on were for the repair or work upon defendant's said car, we think that fact might fairly be inferred from what is alleged; and the evidence shows, or at least tends strongly to show, that such supplies were furnished and the labor performed for and upon said car in an attempt to remedy the defect which prevented it from working properly; unless the evidence to that effect should be excluded on the ground that there was no proper or sufficient proof that the party from whom the defendant purchased the car and who made the repairs or did the work upon the car was plaintiff's agent. The evidence respecting these matters will be more specifically referred to when considering other questions in the case.

The statute provides that a counterclaim which may be set forth by a defendant in his answer must be one existing in favor of the defendant and against the plaintiff, between whom a several judgment might be had in the action, and arising out of the contract or transaction set forth in the petition as the foundation of the plaintiff's claim, or connected with the subject of the action. (Comp. Stat. 1910, Sec. 4391.) Conceding that this counterclaim did not arise out of the contract or transaction alleged as the foundation of plaintiff's claim, we think it is to be regarded as connected with the subject of the action, and for that reason properly pleadable in the action as a counterclaim, if shown to be a claim existing against the plaintiff.

It is not necessary to hold to sustain the counterclaim that the subject of the action brought by the plaintiff was specifically the car sold to the defendant, or the transaction of the sale and purchase of the car, though under the averments of the answer and the evidence it would not be difficult to find a close relation between the sale and the work done upon the

car. But it would hardly be contended that defendant's alleged cause of action would not be pleadable in the action if it had been brought for the purchase price of the car. Although the purchase price had been paid, if the plaintiff sold and warranted the car as alleged by the counterclaim and as the evidence tends to show, it was the duty of the plaintiff to make such warranty good, and since, according to the averments of the answer and the evidence on the part of the defendant, the plaintiff requested and was given the opportunity to put the car in a good running or working condition, and the supplies were furnished and the labor performed for that purpose, those facts would not only be a complete defense to the action, but show the counterclaim to be directly connected with the subject of the action, whether the "subject of the action" is to be regarded as the car, or the sale thereof, or the right claimed to recover the value of the labor and supplies. The courts seem to have found some difficulty in formulating a general rule applicable to all cases for determining what constitutes the subject of the action within the meaning of a statutory provision defining a counterclaim as in our statute above referred to. (Pomeroy's Rem. & Remedial Rights, Secs. 774-776.) Without attempting a thorough discussion of that question we deem it sufficient in this case to say that a general rule may be deduced from the authorities to the effect that within the meaning of such a statute the "subject of the action" is either the property involved (as in the case of a real action or for the recovery of chattels), or a right alleged to have been violated. (Glen & Hall Mfg. Co. v. Hall, 61 N. Y. 226, 19 Am. Rep. 278; B. & O. R. R. Co. v. Hollenberger, 76 O. St. 177, 81 N. E. 184; Pomeroy's Rem. & Remedial Rights, Sec. 775.) The author of the work last cited states as his view that the "subject of the action" is the plaintiff's principal primary right which has been broken, and by means of whose breach a remedial right arises, and he says in the section cited:

"Thus, the right of property and possession in ejectment and replevin, the right of possession in trover or trespass,

the right to the money in all cases of debt, and the like, would be the 'subject' of the respective actions. Although in a certain sense, and in some classes of suits, the things themselves, the land or chattels, may be regarded as the 'subject,' and are sometimes spoken of as such, yet this cannot be true in all cases; for in many actions there is no such specific thing in controversy over which a right of property exists. The primary right, however, always exists, and is always the very central element of the controversy around which all the other elements are grouped, and to which they are subordinate. * * * * * It seems, therefore, more in accordance with the nature of actions and more in harmony with the language of the statute to regard the 'subject of the action,' as denoting the plaintiff's *principal primary right* to enforce or maintain which the action is brought, than to regard it as denoting the specific thing in regard to which the legal controversy is carried on."

Several assignments of error are based upon the admission of evidence as to statements of alleged agents of the plaintiff. From the evidence it appears that the car was purchased sometime in July, 1910, being then delivered to the defendant at Denver by the Studebaker Colorado Vehicle Company to whom the purchase price, $1,350, was paid. Mr. Dildine, an automobile sales agent or dealer through whom in the first instance the car was bought, accompanied the defendant to Denver for the purpose of receiving the car and bringing it to Cheyenne, where the defendant resided. The defendant testified that at the time of the purchase he was given a guarantee printed in a book which was introduced in evidence, showing in large print on the outside front cover the following: "'Price List of Parts E-M-F 30 (the word 'Thirty' running through the figures 30) Manufactured by Studebaker Corporation E-M-F Factories Detroit-Michigan." In the body of the book and in the "Introduction," under the head of "Replacements," the following appears. "Our guarantee means just what it says. You will find a facsimile following this introduction. Read it. The Stude-

baker Corporation E-M-F Factories, guarantees for one year
from date to (of) purchase every part of the car, except
tires (which are guaranteed by the manufacturers), and will
replace any such part free of charge within that time if
break or defect is not the result of neglect, misuse or acci-
dent." At the end of the introduction appears the printed
name and address: "The Studebaker Corporation E-M-F.
Factories Detroit, Michigan." On another page of the book
appears a printed form of guaranty, which in substance and
effect certifies that the Studebaker Corporation warrants and
guarantees the automobile covered thereby for one full year
from the date of sale by dealer, including all material and
equipment (tires excepted) used in connection with the
construction of such automobile; and that if any part or
parts of the car break or prove defective within one year,
and the customer shall forthwith communicate the facts to
The Studebaker Corporation or one of its authorized deal-
ers, giving the number of the car, and the name of the dealer
from whom the car was bought, and the date of purchase,
and if it shall appear that such breakage was not in fact due
to misuse, negligence or accident, The Studebaker Corpora-
tion will furnish such new part either at a branch house, or
at its factory in Detroit, free of charge to the owner.

The defendant testified as to his experience with the car
after receiving it as follows:

"Mr. Dildine, Mr. Stone and his wife and my wife and
myself went to Denver to get this car, and we went to this
Studebaker place and selected this car and had the matter
fixed up, and the next morning early we started for Chey-
enne. We drove out in the car with Mr. Dildine driving and
Mr. Stone and myself in the car. We turned and went down,
I think it is 15th street, and when we got about half way
down the block going north, he started to put it into the
intermediate gear and he couldn't mesh it—it wouldn't work.
He said 'There is something wrong with it,' and then he
kept working on it and said 'I will have to go back to the
garage.' * * * * He turned and went back into the

garage and said something was wrong with the transmission, it wont work. He said that to the people in the garage there. I think Mr. Potter was at the head of this institution at that time. They commenced working on it and they saw it wouldn't work. He commenced with a hammer, and I said 'If you have got to start that way with that car, I dont want it and I wont take it,' and I went to the hotel. After I had been there a while Mr. Dildine come up and wanted to know if I would be satisfied if they took off the box, or whatever you call it—the body—and put it on the running gear of a car that was in the sample room, if that would be satisfactory to me. I said it would, if the car was right, was a good car and worked all right, I had no objection. They worked on it all night and about ten o'clock the next morning we started for Cheyenne, and Mr. Dildine drove the car. He kept complaining of the car. He said it wouldn't pull and didn't act right, and we never got any further than Fort Collins that night. We stayed there all night. * * * * * We left there just at day light and we got here in Cheyenne along way in the afternoon with the car. I complained of it, and he brought it up to my barn and I started to drive it. I went back and told him something was wrong with that car and he could take it back, that I wouldn't accept it, and he said 'General, give us a chance. That isn't working right.' "

After stating, over objection, that Mr. Dildine was the agent here at that time, and that he had purchased the car through him, he testified further: "He (referring to Mr. Dildine) said: 'This is a big company and they will make that car right. Give us a chance. I am just getting in here selling these cars and they will make this car good.' I said 'I wouldn't have a car in the condition it is in. It will not pull on high,' and the matter went along and he told me one day—he told me an agent of the Company was here and that he was an expert and that he would look the car over and see what was the matter with it." Continuing, he testified in substance that the man referred to, a Mr. Lake of the Studebaker Company, took the car with another person and

himself into the country a little ways to see what was the matter with it, and that after having attempted to adjust a difficulty with it, he said that there was no use trying to go any further, and that they then turned and came back to Mr. Dildine's garage—that they took the engine down and tested it out as to ignition to see if each cylinder was striking; that they then took the car down to see what the trouble was with the transmission, and that, as he believed, they sent down to the Studebaker Company in Denver for a carburetor, but did not get what was needed, and that finally they took a carburetor off a car of Mr. Dildine's and put it on defendant's car. That they then started out with the car again, worked on it for three or four days, when Mr. Dildine said that there was something wrong with the car—he did not know what it was, but he would report it to the company in Denver. That he (Dildine) then went to Denver, and the witness afterwards also went there. That he then met Mr. Wilson who was at the head of the company at that place. That Mr. Wilson then said to him with reference to the trouble with the car that if anything was wrong with the engine he would put in a new one and if that was not enough to make good, he would give him a new car.

In his testimony defendant fixed the time of Mr. Lake's visit to Cheyenne as September or October. The exact time when he went to Denver and met Mr. Wilson was not stated, except it was after Lake had tested the car in Cheyenne; but it must have been sometime prior to January, 1911, when one Rosborough was sent to Cheyenne to examine the car. On the occasion of defendant's conversation with Mr. Wilson he had gone to Denver in the car, and after his talk with Mr. Wilson he testified they sent a man from the garage there to go out in the car with the defendant and test it; that it failed to work satisfactorily and was brought back to the garage and left there, the defendant returning to Cheyenne; that afterwards he went to Denver with Mr. Dildine and they came back to Cheyenne with the car, the defendant driving it, but it continued to work badly, and its condi-

tion was thereupon again reported to the Denver company who then sent a man named Rosborough to test the car; that after testing it, together with other cars of the same make, Rosborough asked him how they could settle the matter, and the defendant replied that if the car was all right and as good as any other E-M-F he had nothing to compromise, "but if it isn't, I expect you and the company to make the car good, or you take it back and I want my money." That Rosborough then said there is something wrong with the car but he did not know what it was, and he asked the defendant to let him take the car to Denver; this occurring in January or February, 1911. That the defendant consented to that, and it was done. That the defendant became ill early in March and was confined to his house until in June he went to California, returning in September, 1911, during which period until his return he did not see the car, but when he returned the car was in the Dildine garage in Cheyenne; and it was reported to him that a new engine had been put in, but he afterwards discovered that it was an old engine repaired or reconstructed and in imperfect condition. He further testified, and his testimony in that respect is amply corroborated by the testimony of other witnesses, that after such return of the car it did not work well at any time. No witness seemed to be able to locate the exact cause of the trouble, but it was generally stated to be the lack of power supposed to result principally from a defective engine. It was during the period that the car remained in Denver after Rosborough had taken it there, as we understand the evidence, that the repairs were made resulting in the charges for supplies and labor stated in the account sued on.

The admission of defendant's testimony relating to Lake's and Rosborough's statements was objected to and is here complained of on the ground that it was attempted thereby to prove the agency of said parties by their own declarations, and that there was no other proof of their agency sufficient to justify the admission of such statements. It appears from the record that the rule was well understood and in-

tended to be complied with and enforced during the trial that the fact of agency could not be established by the declaration of the alleged agent; and as to the two parties named we discover no attempt to prove the fact of their agency by their statements or declarations. Independent circumstantial evidence was introduced for that purpose, which we think was at least sufficient, as held by the trial court, to submit to the jury for their consideration in determining the fact of agency. However, the statements of these two persons were confined in effect to admissions respecting the defective condition of the car, and that it was defective was abundantly established by other testimony, though there is some conflict as to the nature and effect of the trouble presented by the testimony of Mr. Dildine.

There is some conflict in the evidence concerning the relation between the Studebaker Colorado Vehicle Company and the plaintiff, presenting the question of fact whether that company was a mere dealer in automobiles and acted only as such in selling the car to the defendant, or was a sales agent of the plaintiff and made the sale in that capacity. The jury must have found that said company sold the car as plaintiff's agent or representative, or at least with authority to sell the car with plaintiff's warranty and furnish the necessary parts or labor to put the car in proper condition; and we think the evidence sufficient to sustain such a finding.

Authenticated copies of certain certificates of incorporation were offered by the plaintiff and admitted in evidence for the evident purpose of showing that the plaintiff company was not in existence at the time of the sale; one of the certificates showing the incorporation of "The Studebaker Corporation," under the laws of New Jersey, on February 14, 1911, and another the incorporation, under the laws of the same state, on August 14, 1911, of "The Studebaker Corporation of America." And the secretary of the Denver company testified that said company was not an agent of either of said Studebaker corporations, but handled Studebaker cars. On cross-examination he admitted that his

company was advertised as distributing agents, which he said was merely a method of advertising; and also that he had recently visited Cheyenne, but acting, as he said, for his own company, and explained to the defendant on that occasion the policy of his company, and all Studebaker companies, and proposed a certain thing to him, which was met by a counter proposition by the defendant, and that, as a result thereof, he (the witness) had wired to and received an answer from the plaintiff. He was not asked to and did not state what the respective propositions were, or what he wired to the plaintiff or the answer thereto; the court having previously announced that any evidence of an offer of compromise would not be admitted. The same witness further testified that his company bought the car sold to defendant from the Everitt-Metzger-Flanders Company, and in that connection a draft for $6,585 was offered and admitted in evidence, which the witness said included the cost price of the car sold to defendant, and which appears to have been drawn by "The E-M-F Company" at Detroit, Michigan, upon the "Studebaker Bros. Mfg. Co., Denver, Colo." and dated May 3, 1910, and which, as we understand his testimony, was paid by the Studebaker Colorado Vehicle Company. In the same connection a bill or invoice was also admitted in evidence dated April 22, 1910, stating April 5, 1910, as the "order date," which the witness identified as probably for the car in question. On its face the invoice was from or by the "E-M-F Company, Detroit, Mich." and mentions as directions for shipment, "Order of Everitt-Metzger-Flanders Co. Denver, Colo. Studebaker Bros. Col. Veh. Co.," and the price as $1,250 less 18 per cent, making the net price $1,025. It included also some extras not here involved.

Respecting the corporate name and identity of the plaintiff and the period of its existence, it appears that the defendant claimed on the trial that the incorporation of "The Studebaker Corporation" and "The Studebaker Corporation of America" respectively, under the certificates afore-

said, was in each instance a re-incorporating or reorganization under another name of a company or concern already in existence, and of the particular company that manufactured and sold the car purchased by the defendant. In support of that claim the defendant introduced in evidence not only the published book above mentioned, appearing to have been issued by The Studebaker Corporation and given to defendant, as he testified, in 1910 when he bought the car, but other and later books each entitled "Studebaker Proof Book" purporting to have been published by the plaintiff, and containing statements as proof of the reliability of the plaintiff company and the quality of its manufactured products to the effect that the institution had been engaged in successful manufacturing for many years. Our attention is called to a place in one of the books, which we understand was distributed in 1912, where it is stated: "This great establishment (referring to the Studebaker automobile factories) is the development of 61 years experience in successful manufacturing. The Studebaker reputation for honesty and quality of manufacture is literally universal." And to a subsequent page of the same book where it is stated: "The Studebaker Corporation has built up its organization through sixty years of experience." And to another book probably issued in 1913, where it is stated: "We call this little volume our 'Proof Book.' The facts it contains * * * * * should prove to you the big, solid foundation · of scientific manufacture and honest purpose on which has been built the Studebaker business success of more than sixty years' standing." And this also: ·"Back of the Inspector General there is the General Manager. * * * * It is he who must see to it that the Studebaker Corporation today lives up to its policy of sixty years' standing." These books contain other material statements, including, in the one first mentioned, a list of "Distributing Branches," naming among them the Studebaker-Colorado Vehicle Co. at Denver, Colo., and in one or both of the others a reference to plaintiff's vast sales organization, and

its large number of branches, covering this entire country, so that "hardly a city of any size can be found in which there is not a Studebaker representative." The certificate of February 14, 1911, incorporating the "The Studebaker Corporation," states among the objects for which the company was formed the following:

"(1.) To purchase, acquire, receive and take over (1) the assets and property of every character whether tangible or intanglible and including good-will * * * * * of (a) Studebaker Brothers Manufacturing Company, a corporation organized and existing under the laws of the State of Indiana, and engaged in the manufacture and sale of automobiles, carriages, wagons and other vehicles at South Bend, Indiana, and elsewhere; and (b) Everitt-Metzger-Flanders Company, a corporation organized and existing under the laws of the State of Michigan and engaged in the manufacture and sale of automobiles and other kindred articles in the City of Detroit, Michigan, and elsewhere—subject to the debts, liabilities and obligations of said corporations, as shown on their respective books of account; * * * * * (2.) To empower any of the present directors of either said Studebaker Brothers Manufacturing Company or said Everitt-Metzger-Flanders Company, to be and become incorporators, directors and stockholders in this Company and as such incorporators, directors and stockholders to vote for and authorize the acquisition of the property and shares of stock of said Studebaker Company and said Flanders Company and to relieve the incorporators and directors of this Company from any disqualification which might otherwise exist, from so acting."

Aside from the inferences in favor of defendant's contention that these facts might warrant, other evidence on the subject was introduced by the defendant, consisting of letters passing between the plaintiff and defendant. Those written by the plaintiff might, we think, be reasonably understood as tacitly admitting that it was practically the same company that had manufactured defendant's car, or had as-

sumed the obligation of such company with reference to it, and that the Denver company was its agent and acted as its representative in the sale of the car. Shortly after September 1, 1912, the defendant received a letter of that date purporting to be written from the general offices at South Bend, Indiana, of The Studebaker Corporation, and to be signed by said corporation in that name, stating: "We are verifying the accounts of our Denver Branch and find the following charges against your account, viz: $293.15. Please be kind enough to advise us, by returning this memorandum, properly noted, in the enclosed envelope; whether or not the account is correct and oblige." The defendant returned that letter to plaintiff, as requested, on October 8, 1912, and stated that the account was incorrect, that he did not owe the Denver Branch anything, that he was confined to his home by sickness and as soon as he was able, probably in a few days, he would send a true statement of the treatment received from their agents. The amount stated in said letter to the defendant was the exact amount of the account sued on, excepting certain credits allowed before suit brought, and clearly represented the repairs aforesaid.

On November 13, 1912, the defendant wrote the Studebaker Corporation, addressing it at South Bend, Indiana, setting out the facts of his purchase of the car, its defective condition, his continual complaints about it, the sending of men here from Denver to test it, his calling Mr. Wilson's attention to the matter, and what the latter had said about it, and other things that had occurred in connection with the matter up to that time, and concluding the letter as follows: "I believe I am entitled to better treatment at the hands of your agents, and that you should send a representative here to thoroughly investigate this matter, and I further believe that you will agree with me that I have not had a square deal. * * * * * There are a great many other details I have not gone into that I would be very much pleased to present to your representative on reaching here. Please advise me if these suggestions meet

with your approval, and if you will send a representative. If so, advise me at what time he will come, so that I may be prepared to furnish him every. detail connected with this matter."

The first answer to that letter was from the Studebaker Corporation E-M-F Factories, Detroit, Michigan, dated November 21, 1913, and stated that defendant's letter had been referred to "our Denver Branch, for their report on this transaction." Further answering the letter the Studebaker Corporation, that name being printed upon the letter head, and under which appears (also printed) "E-M-F Factories Detroit, Michigan," on January 8, 1913, wrote the defendant commencing as follows: "With further reference to correspondence passing between us relative to' a· charge on the books of our Denver Branch, beg to advise that we have taken this matter up with our Denver Branch, as well as with Mr. Wilson, who is now acting as Special Representative in our Eastern Territory." And it was further stated, among other things, as follows: "Mr. Wilson advised us that quite a good deal of work was put on the car before the motor was changed and when they finally decided to change the motor, he selected one that was an exceedingly good puller, but that when this motor was installed in your car the same effect was obtained, when it was finally·· decided to change the tires, putting on our standard size tires, after which the car worked perfectly and had an abundance of power. * * * * While the report that we have received in this case would seem that your difficulties have been caused by.conditions over which we had no control and for which we could not be held responsible, and the invoices with possible slight corrections should be paid by you, we are recommending to the Denver branch that some allowances be made on this account and trust when you receive these allowances, you will see your way clear to pay the balance due." Following that letter the defendant received a letter from the "The Studebaker Corporation of America" purporting to have been written at

the Denver branch of the Studebaker Automobile Division (the printed letter head containing that information), in which it was stated that upon the advice of the home office a credit memorandum amounting to $27.82 was enclosed covering all "parts" charged to the defendant on repair work, as shown by his balance. And on March 18, 1913, using a letter head upon which is printed "The Studebaker Corporation, General Offices, South Bend, Ind., U. S. A.," a letter was addressed to the defendant at Cheyenne and signed in typewriting, "The Studebaker Corporation," stating in substance that since the defendant had been written on January 8, by the Claims Department at Detroit, in reply to his complaint, he had paid no further attention to the open account on the books of "our Denver Automobile Branch." That further credits in accordance with the recommendation of said Claims Department had been passed by the Denver Branch, leaving the net amount due $268.58. That the collection was being handled direct from the executive offices at South Bend and the defendant's immediate remittance in settlement would be appreciated. That the letter was their final direct request for settlement and if payment was not immediately made the account would be placed in the hands of their attorney.

It is argued that the Colorado company could not have sold the car as agent, since it bought and paid for the same as shown by the testimony of the secretary of that company, in connection with the draft and invoice aforesaid. But that fact would not alone disprove the agency with respect to the matters involved in the case, in view of the other evidence. It is said that an "agency," within the meaning of the automobile trade, consists in giving to the agent the right to purchase from the manufacturer machines at a discount from the list price, and to retail them to customers within specified territory at the full list price. "In other words, no commission, as such, is paid to an agent on the sale of an automobile, but he has the exclusive right to certain territory and purchases on his own account at a

discount from the retail or list price." (Berry on Law of
Automobiles, Sec. 231; Huddy on Automobiles, 3rd Ed.,
Sec. 328; Frederickson v. Locomobile Co. of America, 78
Neb. 775, 111 N. W. 845; Joslyn v. Cadillac Automobile
Co., 177 Fed. 863, 101 C. C. A. 77; Wheaton v. Cadillac
Automobile Co., 143 Mich. 21, 106 N. W. 399; Federal
Rubber Co. v. King, 12 Ga. App. 429, 76 S. E. 1083; Wil-
cox & Gibbs Sewing Mach. Co. v. Ewing, 141 U. S. 627,
12 Sup. Ct. 94, 35 L. Ed. 882.) In the case last cited the
court, by Mr. Justice Harlan, said: "There was some discus-
sion at the bar as to whether Ewing was, strictly, an agent
of the company. We think he was. He was none the less
an agent because of his appointment as 'exclusive vendor'
of the defendant's machines within a particular territory,
or because of the peculiar privileges granted to or the pe-
culiar restrictions imposed upon him. * * * * It is true
that the machines he undertook to sell were to be pur-
chased by him from the company at a large discount. But
he could not sell them by retail below the regular retail
prices. This arrangement was the mode adopted to protect
the company's interests, and to secure the plaintiff such
compensation for his services as would induce him to de-
vote his time, attention and abilities to the company's in-
terests. He was still a mere agent to sell such machines as
might be delivered to him under the contract."

The plaintiff did not introduce or offer in evidence the
contract, if any, under which the Denver company · was
engaged in selling the E-M-F or Studebaker cars, nor offer
to show what the arrangement was between said company
and the manufacturer. It seems to us that there must
have been some arrangement or contract, and that it was
within the power of the plaintiff, especially as the secretary
of the Denver company was a witness in its behalf, to show
what such arrangement or contract was, if it was different
from that which might be inferred from its correspondence
with the defendant and the other evidence in the case.

.The plaintiff's first letter, dated September 1, 1912, de-

fendant's answer written thereon, and his November letter further explaining the matter, were shown by copies, and they were severally objected to on that ground. Such objections were at first sustained, but after defendant had further testified showing the details of mailing the letters he had written and the return of the one he had received, and identifying the copies, the September letter and the answer returned with it were admitted as explanatory of plaintiff's subsequent letters, the originals of which had previously been offered and admitted. Pending the consideration of the offer of these copies, defendant's counsel demanded that the plaintiff produce the originals, plaintiff's counsel responding thereto by saying that all the records and correspondence of the plaintiff were in South Bend, Indiana. It is here earnestly contended that the admission of said copies was error. The court may have regarded the letters as so intimately connected with the issues in the case that a duty rested upon the plaintiff to have the originals in court, and that the notice given on the trial to produce them was sufficient to authorize the secondary evidence. But we are not inclined to scrutinize the action of the court very closely as to this evidence, for, even if erroneous, it would not justify a reversal. The only effect of defendant's letters was to explain the purpose of the later correspondence, and without them we think such purpose is made evident by plaintiff's subsequent letters; and the effect as proof of identity or agency of the September letter is merely cumulative, for similar references to the Denver branch are in the other letters, so that these shown by copy might be excluded without materially lessening the effect or weight of the correspondence as evidence for the purpose for which the same was offered.

The defendant testified that after this suit was brought he met a Mr. Hicks in Cheyenne, who stated to him that he was "here to settle this Studebaker business," that he was the general agent in this western country, and, in substance, that the several Studebaker companies, though un-

der different names from time to time, were all one and
the same concern or company; the latter statement being
made after the defendant had said that the plaintiff had
raised the question to beat him out of the car. The admis-
sion of these statements by Hicks was excepted to and it
is here earnestly contended that the ruling of the court in
that respect was error, for the reason that the agency of
Hicks and his authority to make such statements was not
sufficiently shown. Proof was offered to show his agency
independent of his said declarations, and before his state-
ments as to the relation between the different Studebaker
companies had been admitted, and a careful consideration
of that proof has convinced us that it was sufficient to
justify the submission of the question to the jury. The
witness Roberts, who had been associated with Mr. Dil-
dine in the automobile business, testified that he had known
said Hicks about two years, during which period he had
acted in the capacity of the Studebaker company's district
manager, and that he understood him to be such manager;
also that he knew him to have been here at the time of
the conversation testified to by the defendant, and that he
was here every few weeks acting as district manager, and
at different times when here checked up the accounts of
the local agency. The defendant testified that he had seen
Hicks a number of times at Cheyenne and also at the Stu-
debaker place of business in Denver. And no evidence was
introduced by the plaintiff to disprove the fact of the
agency of Hicks or his authority to represent the plaintiff
or make the statements aforesaid, nor to disprove the fact
of the agency or authority of the other parties—Lake and
Rosborough—whose statements had been admitted in evi-
dence.

It is further contended by counsel for plaintiff in error
that there was no evidence of the value of such a car as
the defendant bought in the condition as warranted, and
that, therefore, the evidence was insufficient to sustain a
verdict for more than nominal damages. But we think

there was evidence tending to show the value of the car if in good condition to have been the sale price paid by the defendant. Indeed that fact is shown by the testimony of Mr. Dildine, a witness for the plaintiff, which in that particular was to the effect that the value as received, taking into consideration its condition at that time, was $1,250, and that in placing that value upon the car as received he had deducted $100 from the list price; clearly indicating that the list price would represent the value of the car in perfect condition. It is also contended that Mr. Dildine's testimony is the only evidence showing the amount of the damages and that the verdict for more than $100 is excessive. But aside from the testimony of Mr. Hanson to the effect that the car in the condition in which he received it was practically of no value, the evidence tended to show, and from it the jury might properly find, that the principal defect was in the engine, and that it would at least require a new and perfect engine to put the car in good condition. And the evidence shows that the cost of such an engine would be $500, and of course it would require some work to install it. We are of the opinion that the evidence was sufficient as to value and damages to sustain the finding in the sum of $550.

Error is assigned also upon one instruction with reference to the measure of damages, which it is claimed is inconsistent with another on the same subject. The jury were told in one instruction (No. 4) that the measure of damages would be the difference in price paid for the automobile by the defendant and its real value, considering such defects as they should find from the evidence actually existed at the time of the purchase; and in a later instruction (No. 8) that the measure of damages would be the difference between the value of the automobile which defendant received and its value if it had been as represented by the written warranty. It is conceded that the latter instruction correctly stated the law as to the measure of damages. While there might be an apparent conflict between the two instructions, considered generally, they are not in fact in-

consistent when applied to the evidence in this case. As above stated, the evidence as to the value of the car in good and perfect condition was to the effect that such value was the amount of the purchase price, and hence the damages would necessarily be the same under either instruction.

Other errors are assigned with reference to instructions requested, which we think unnecessary to consider, in view of the preceding discussion. We are of the opinion that the verdict is sustained by the evidence, and as we find no prejudicial error in the record the judgment will be affirmed.                                                      *Affirmed.*

BEARD, J., and SCOTT, J., concur.

### ON PETITION FOR REHEARING.

POTTER, CHIEF JUSTICE.

A petition for rehearing has been filed in this case by counsel for plaintiff in error. In disposing of it we deem it unnecessary to again enter upon a discussion of the question of the agency of the concern from whom the car was purchased by the defendant. We held that the evidence was sufficient to establish the fact of such agency, to the extent at least that it was authorized to sell the car with plaintiff's warranty and supply the necessary parts and labor to put the defective car in proper condition. But it is stated in the brief in support of the petition for rehearing that the only evidence on that question was the testimony of the witness Roberts and the defendant concerning the actions and statements of Mr. Hicks, particularly his statement that the several Studebaker companies were one and the same. That was not the only evidence on the question. The several letters written by the plaintiff to the defendant, referred to and quoted from in the former opinion, were not only competent and pertinent upon the question, but tended strongly as admissions to show the identity of plaintiff corporation as the one for whom the car had been sold and warranted, and also the agency of the concern who sold it.

It is argued also that the question in the case as to this matter of agency was not the sufficiency of the evidence, but its admissibility.   But we held that the evidence objected to was competent and admissible, and, therefore, referred to it in considering whether the evidence was sufficient to sustain the verdict.   And we remain of the opinion that it was competent and properly admitted.   As to certain letters shown by copy, we held, without deciding whether the notice to produce the originals was sufficient or not to render the copies admissible, that the ruling admitting them would not, if erroneous, justify a reversal; the reason therefor being stated in the opinion.   And, therefore, we said that we would not be inclined to scrutinize very closely the action of the court in admitting such copies, though we suggested that the court may have regarded the notice on the trial to produce as sufficient on the ground that a duty rested on the plaintiff to have the originals in court as papers intimately connected with the issues in the case.

Counsel also find ground for complaining of the decision in that, as stated in the brief, the plaintiff was held by this court to the same consequences as by the jury, because of its silence as to facts attempted to be proven by incompetent evidence.   But we held that the evidence referred to was not incompetent, and we are constrained to adhere to that view, for we remain convinced that the trial court properly applied the rules of evidence relating to the admission of the declarations of alleged agents.   We suppose that counsel refers to the remark in the former opinion, after reciting the evidence as to the agency of Hicks and others, that no evidence was introduced by the plaintiff to disprove the fact of such agency, as well as a similar remark concerning the failure of the plaintiff to produce or offer in evidence the contract, if any, under which the Denver company was engaged in selling cars of the kind sold to defendant, or to offer to show what the arrangement was between the said selling company and the manufacturer, in which connection we said:

"It seems to us that there must have been some arrangement or contract, and that it was within the power of the plaintiff, especially as the secretary of the Denver company was a witness in its behalf, to show what such arrangement was, if it was different from that which might be inferred from its correspondence with the defendant and the other evidence in the case."

Now that was not going out of the record or supplying something through the imagination to cure a failure of proof, as counsel seem to suggest. We had in mind a familiar rule of evidence, which is stated in Jones' Commentaries on Evidence as rewritten by Horwitz (The Blue Book), as follows:

"It is a well-settled rule of evidence that when the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead or rebutting, would support, the inferences against him, and the jury is justified in acting upon that conclusion." (Vol. 1, Sec. 19.)

In Jones on Evidence, 2nd Ed., Sec. 19, the presumption from failure to produce evidence is thus explained: "The mere withholding or failing to produce evidence, which under the circumstances would be expected to be produced and which is available, gives rise to a presumption against the party. It is a presumption less violent than that which attends the fabrication of testimony or the suppression of documents in which other parties have a legal interest; but the courts recognize and act upon the natural inference that the evidence is held back under such circumstances because it would be unfavorable," and the author quotes the following remark of Lord Mansfield in Blatch v. Archer, Cowp. 66:. "It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other to have contradicted."

The rule is referred to in Wigmore on Evidence (Vol. 1, Sec. 285), and the learned author concludes the discussion of the matter by saying: "The non-production of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its tenor is unfavorable to the party's cause." Several cases are then cited and quoted from to illustrate the rule, including Blatch v. Archer, *supra,* and R. v. Burdett, 4 B. & Ald. 122, wherein Best, J., said: "If the opposite party has it in his power to rebut it by evidence, and yet offers none, then we have something like an admission that the presumption is just." Of course, if the case of one party is not established by competent evidence, it is not necessary for the other to produce any, and no presumption will in such case arise against him. But that is not the situation in this case in our view of the evidence.

We said in the former opinion, referring to the objection to the admission of copies instead of the originals of certain letters, that they were admitted as explanatory of plaintiff's subsequent letters. Counsel do not so understand the record. What the trial court said when first ruling that such copies be admitted is this: "As part of this correspondence has gone in, I believe I will permit this in evidence." Upon that statement our remark was based that the copies were admitted as explanatory of the subsequent letters, the originals of which had been admitted, and that seemed to the writer to express what was intended by the language quoted. It may be that it does not correctly represent the thought in the mind of the trial court, but we think it immaterial, if it does not. The only effect of the letters, as stated in the original opinion, was to explain the later correspondence. Counsel also seem to challenge the correctness of the statement in that opinion to the effect that such copies were admitted following a ruling at first sustaining an objection thereto, after the defendant had further testified showing the details of mailing the letters he had written and the return of the one he had received, and identifying the copies.

There is just this much to sustain counsel's understanding of that matter, if it differs from the writer's. The record shows that the objections were at first sustained. Then came the demand for the production of the originals. Following the explanation of the plaintiff's counsel in reply to such demand, the court made the remark quoted above directing that the copies be admitted. But counsel for plaintiff then proceeded to cross-examine the defendant, who was on the stand, and after one question had been propounded and answered, another objection was interposed to the copy of one of the letters, on the ground that no foundation had been laid for secondary evidence, whereupon the trial judge stated that he did not know that sufficient foundation had been laid, and defendant's counsel at once proceeded to examine him relative to the mailing and the accuracy of the copies of the letters he had written and the original of the one he had received and returned; and he was cross-examined upon the matter. The objections to the copies were then renewed, and overruled. Thus, they were not finally admitted until the further testimony mentioned in the opinion. This is, however, immaterial, in view of the ground upon which the exceptions to said rulings were and must be disposed of by this court, viz: that as merely cumulative evidence the admission of the secondary evidence, even if erroneous, would not justify a reversal.

In commenting upon the evidence relating to the damages, counsel overlook the testimony of the defendant that the car he received was practically of no value, as well as other evidence explaining the condition of the car. There ought to be no difficulty in understanding the ground or the reasoning upon which we held the two instructions as to the measure of damages not inconsistent when applied to the evidence in the case, and that the case should not be reversed for a technical misstatement of the law in one of said instructions. We think it unnecessary to add to what was said in the original opinion concerning those instructions.

One of plaintiff's contentions on the trial appears to have been that several causes of action were stated in defendant's

counter-claim, on which only the case was tried, and, at the close of the evidence for defendant, the plaintiff moved that the defendant be required to elect upon which such several causes of action "he seeks to proceed," whether on the written warranty, the oral warranty, an implied warranty, or upon a right to recover back the money expended. It is now insisted that the refusal of the court to direct such election was error. The point was not made in the original brief, and the exception to the ruling was, therefore, waived.

We perceive no good reason for granting a rehearing, and therefore, the application will be denied.

BEARD, J., concurs.

SCOTT, J., did not participate in this decision.

